# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
### WHEELING DIVISION

**WENDY M. STEELE,**

        **Plaintiff,**

**v.**                                    **Civil Action No.: 5:11-cv-84**
                                             **JUDGE STAMP**

**MICHAEL J. ASTRUE,**
**Commissioner of Social Security,**

        **Defendant.**

## REPORT AND RECOMMENDATION TO THE DISTRICT JUDGE RECOMMENDING THAT THE DISTRICT COURT DENY PLAINTIFF'S MOTION FOR JUDGMENT ON THE PLEADINGS [11], GRANT DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [12], <u>AND AFFIRM THE DECISION OF THE ADMINISTRATIVE LAW JUDGE</u>

## I. <u>INTRODUCTION</u>

On June 13, 2011, Plaintiff Wendy M. Steele ("Plaintiff"), by counsel Craig Lavender, Esq., filed a Complaint in this Court to obtain judicial review of the final decision of Defendant Michael J. Astrue, Commissioner of Social Security ("Commissioner" or "Defendant"), pursuant to Section 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g). ( ECF No. 1.) On August 10, 2011, the Commissioner, by counsel Helen Campbell Altmeyer, Assistant United States Attorney, filed an Answer and the administrative record of the proceedings. (Answer, ECF No. 7; Administrative Record; ECF No. 8.) On September 8, 2011, Plaintiff filed her Brief in Support of Judgment on the Pleadings. (Pl.'s Br. in Supp. of J. on Pleadings ("Pl.'s Br."), ECF No. 11.) On October 6, 2011, the Commissioner filed his Motion for Summary Judgment. (Def.'s Mot. for Summ. J. ("Def.'s Mot."), ECF No. 12.) Following review of the motions by the parties and the transcript of the administrative proceedings, the undersigned Magistrate Judge now issues this

Report and Recommendation to the District Judge.

## II.   BACKGROUND

### A.   *Procedural History*

On June 24, 2008,[1] Plaintiff protectively filed a Title II claim for disability insurance benefits ("DIB") and a Title XVI claim for supplemental security income ("SSI"), alleging disability that began October 27, 2005.  (R. at 122-26, 131-33.)  Both claims were initially denied on September 2, 2008 and again upon reconsideration on December 3, 2008.  (R. at 58-67, 70-75.)  On January 30, 2009, Plaintiff filed a request for a hearing, which was held before United States Administrative Law Judge ("ALJ") Toby J. Buel, Sr. on August 25, 2009 in Parkersburg, West Virginia.[2]  (R. at 76, 85-89.)  Plaintiff, represented by Angela Thompson, Esq., appeared and testified, as did Casey Vass, an impartial vocational expert, and Drs. Judith Brendemuehl and Joseph Carver. (R. at 28.)  On November 12, 2009, the ALJ issued an unfavorable decision to Plaintiff, finding that she was not disabled within the meaning of the Social Security Act ("Act").  (R. at 20-27.)  On April 18, 2011, the Appeals Council issued an unfavorable decision to Plaintiff, finding that she was not disabled within the meaning of the Act and that she was able to perform her past relevant work as a store

---

[1]  The ALJ's decision lists a date of March 10, 2008 for when Plaintiff filed her application for DIB and a date of June 16, 2008 for when Plaintiff filed her application for SSI. (R. at 20.)  However, her applications, contained as Exhibits 3D and 5D in the Administrative Record, both refer to a date of June 24, 2008. (R. at 122, 131.)  There is no mention of March 10, 2008 in either application.  Furthermore, the only mention of June 16, 2008 is in Plaintiff's application for SSI and refers to Plaintiff's "fugitive felon/parole or probation violator" status as of that date. (R. at 132.)

[2]  The cover sheet for the transcript of the hearing before the ALJ notes that it was held in Wheeling, West Virginia on November 12, 2009. (R. at 28.)  However, during the hearing, the ALJ noted that they were located in Parkersburg. (R. at 32.)  Furthermore, the ALJ's decision specifically states that the hearing was held on August 25, 2009 in Parkersburg, West Virginia. (R. at 20.)

manager. (R. at 4-6.) The decision of the Appeals Council became the final decision of the Commissioner, and Plaintiff now requests judicial review of the decision denying her applications.

**B.**     *Personal History*

Plaintiff was born on March 8, 1952 and was 56 years old when she filed her DIB and SSI applications. (R. at 122, 131.) She completed eighth grade and has prior work experience as a store manager. (R. at 154, 158.) She was not married at the time she filed her DIB and SSI claims; however, she noted two previous marriages in her applications. (R. at 123, 131.) She has no dependent children. (R. at 123.)

**C.**     *Medical History*

**1.**     **Medical History Pre-Dating October 27, 2005**

On November 10, 2004, Plaintiff visited Carla Scharf, PA-C, for a follow-up appointment after an MRI done on her left knee. (R. at 448.) Scharf noted that Plaintiff had a baker's cyst on her left knee and that she also had anxiety from the loss of a loved one. (*Id.*)

On January 4, 2005, Plaintiff told Scharf that she was experiencing worse panic attacks. (R. at 449.) She also reported experiencing vomiting and anxiety attacks. (*Id.*) Scharf prescribed Lexapro and assessed gastroenteritis, anxiety, panic attacks, and the baker's cyst. (*Id.*)

**2.**     **Medical History Post-Dating October 27, 2005**

Plaintiff sustained an injury to her right shoulder on August 2, 2005. (R. at 218.) Eight days later, Plaintiff visited the emergency room at the Grafton City Hospital complaining of pain in her right shoulder. (R. at 420.) Dr. Christopher Villaraza II noted that Plaintiff had "limited abduction of the right shoulder at 90 degrees because of pain." (*Id.*) However, X-rays of the shoulder did not show any fractures or dislocation. (R. at 420-21.) Overall, Dr. Villaraza assessed an acute sprain

and strain in Plaintiff's right shoulder.  (R. at 420.)

On September 28, 2005, Plaintiff had a follow-up appointment with Dr. Mark Witkowski for her shoulder injury.  (R. at 451.)  Dr. Witkowski assessed a right shoulder strain with muscle spasms, ordered an MRI, and continued Plaintiff's prescription for Skelaxin.  (*Id.*)

An MRI taken in October 2005 suggested that Plaintiff had sustained a rotator cuff tear.  (R. at 219, 402.)  Plaintiff received some physical therapy during this time.  (R. at 219, 235.)  On October 27, 2005, Dr. Witkowski noted that Plaintiff did have a decreased range of motion in her right shoulder.  (R. at 453.)  A month later, Dr. Witkowski noted that Plaintiff reported more weakness in her right shoulder and that she was not really able to move it at all.  (R. at 454.)  He prescribed an evaluation for physical therapy.  (*Id.*)  On January 4, 2006, Dr. Witkowski noted that Plaintiff's right shoulder did not show any signs of swelling and that she was able to abduct her arm approximately 80 degrees, forward flex to about 80 degrees, and complete an external rotation of about 30 degrees before feeling extreme pain.  (R. at 455.)  He continued Plaintiff on a physical therapy regimen two to three times per week.  (*Id.*)

On November 13, 2005, Plaintiff visited the emergency department of the Grafton City Hospital "complaining of transient dizzy spells."  (R. at 409.)  She stated that she felt dizzy and faint, but denied vomiting, headaches, and loss of consciousness.  (*Id.*)  Dr. Villaraza assessed vertigo and noted that Plaintiff was "alert, oriented and coherent."  (*Id.*)  Furthermore, a CT scan of Plaintiff's head showed "no evidence of acute infarct or hemorrhage."  (R. at 409, 414.)

On March 21, 2006, Dr. George Bal performed arthroscopic surgery (including an open rotator cuff repair) on Plaintiff's right shoulder.  (R. at 228.)  Two days later, Plaintiff began physical therapy as assigned by Dr. Bal.  (R. at 220.)  Afterwards, Dr. Bal's progress notes reveal

that even though Plaintiff experienced some pain and discomfort, her right shoulder was improved. (*See* R. at 239, 242, 245, 247, 251, 253, 255, 256, 259.)

On June 1, 2006, Dr. Jack Koay examined Plaintiff for an Independent Medical Examination ("IME") for the purposes of a workers' compensation claim. (*Id.*) Dr. Koay's examination did not reveal any remarkable physical or psychiatric findings. (R. at 221.) He found that she was "alert, active, awake, friendly, and cooperative" and was able to recount her history well. (R. at 223.) Dr. Koay noted a negative neurovascular examination for Plaintiff's entire right upper extremity. (*Id.*) Overall, he concluded that Plaintiff's right shoulder had not yet reached maximum medical improvement, that she was temporarily totally disabled, and that she should be re-evaluated after she completed physical therapy or was released from Dr. Bal's care. (R. at 227.)

On October 16, 2006, Dr. Bal ordered Plaintiff to be sent for a functional capacity exam. (R. at 253.) He received those results and reviewed them on December 4, 2006. (R. at 255.) The functional capacity examination revealed that Plaintiff had the ability to perform "within the light-medium physical demand classification" and that she was "mainly limited by her right shoulder discomfort." (*Id.*) Based on these results, Dr. Bal prescribed physical therapy with a specific focus on strengthening. (*Id.*).

On November 9, 2006, Dr. Charles Lefebure conducted an IME of Plaintiff. (R. at 272-78.) He determined that Plaintiff was in a "fairly stable state" eight months after surgery. (R. at 275.) Dr. Lefebure did not see any complications from either the injury or the surgery, but noted that Plaintiff was "moderately limited in her function." (*Id.*) A week later, Plaintiff had an examination at the Grafton City Hospital for unspecified chest pain. (R. at 368.) The examination revealed "no focal infiltrates and no pleural effusions." (*Id.*) A week later, on November 28, 2006, Plaintiff

visited the Grafton City Hospital again for epigastric pain. (R. at 371.) The exam did not reveal any abnormalities in Plaintiff's esophagus, stomach, and proximal duodenum. (*Id.*)

Plaintiff met with Dr. Bal again on January 18, 2007. (R. at 256.) At this appointment, she reported that she was currently lifting between 27 and 30 pounds at work conditioning and noted that she felt she was making some improvements. (*Id.*) Dr. Bal gave Plaintiff a new prescription for work conditioning because Plaintiff wanted to continue the program to "see if she [could] make it back up to the weight requirement for her job." (*Id.* (alteration in original).)

On January 24, 2007, Plaintiff was examined at the Grafton City Hospital for migraine headaches. (R. at 382.) She complained of pain in the right side of her head that radiated down to her neck and jaw. (R. at 374.) However, a CT scan of her head did not reveal any abnormalities. (R. at 382.) The scan revealed "no evidence of intracranial hemorrhage, shift of midline structures, extra axial fluid collection, mass, or mass effect." (*Id.*)

On January 30, 2007, Plaintiff met with Dr. Witkowski for a follow-up appointment. (R. at 437.) She complained of pain in the right side of her head from her temple to her jaw. (*Id.*) Dr. Witkowski assessed possible right temporal arteritis and told Plaintiff to set up a temporal artery biopsy with Dr. Frank at the hospital. (*Id.*)

On February 5, 2007, Dr. Charles Frank conducted a right temporal artery biopsy on Plaintiff because of Plaintiff's complaints of right temporal headaches. (R. at 329.) This procedure revealed minimal arteriosclerotic changes and no evidence of temporal arteritis. (R. at 330.) Two weeks later, on February 15, 2007, Plaintiff underwent a brain MRI that did not identify any acute infarction. (R. at 339.) The MRI also did not reveal any other abnormalities. (*Id.*) Two days later, Plaintiff followed up with Dr. Witkowski and reported that she still had some pain in the right side

of her head going to her jaw.  (R. at 438.)  Dr. Witkowski continued to suspect right temporal arteritis but noted that he was still waiting for the biopsy results.  (*Id.*)

On February 14, 2007, Dr. Witkowski noted that Plaintiff appeared a "bit anxious" during her appointment with him.  (R. at 439.)  She complained of some pain on both the right and left sides of her head.  (*Id.*)  Dr. Witkowski ordered an MRI of Plaintiff's head and noted that the temporal artery biopsy "showed some minimal atherosclerotic disease."  (*Id.*)

On March 8, 2007, Plaintiff underwent a spinal MRI that did not reveal "significant spinal stenosis."  (R. at 332.)  However, the MRI did reveal degenerative disc changes at C5-6 with bulging discs towards the left side of the spine.  (*Id.*)  A duplex scan conducted the same day noted no significant stenosis in Plaintiff's carotid arteries.  (R. at 333.)

Plaintiff returned to see Dr. Bal on March 22, 2007.  (R. at 259.)  She reported that she had not been going to work conditioning because of "systemic medical conditions."  (*Id.*)  Dr. Bal noted that she had been experiencing severe headaches and aches in her joints and muscles.  (*Id.*)  Plaintiff also told Dr. Bal that her shoulder ached somewhat but that she had been using it normally.  (*Id.*)  Dr. Bal concluded that Plaintiff had reached her maximum medical improvement and referred her back to Dr. Witkowski.  (*Id.*)

On April 5, 2007, Dr. Lefebure conducted another IME of Plaintiff.  (R. at 264-70.)  In his report, Dr. Lefebure noted no other reasons for Plaintiff's shoulder problems other than her work-related injury.  (R. at 267.)  He concluded that Plaintiff's shoulder had not deteriorated and that she had no complications for the injury.  (*Id.*)  However, Dr. Lefebure explained that her other complaints of problems with her neck, back, and upper and lower extremities were "too vague and broad to come to a specific diagnosis."  (R. at 265, 267.)  Overall, Dr. Lefebure found that Plaintiff

had reached her maximum degree of medical improvement and had an eight percent whole person impairment. (R. at 268.)

On April 9, 2007, Plaintiff reported to Dr. Frank for an esophagogastroduodenoscopy with biopsy at the Grafton City Hospital. (R. at 323.) She had this procedure after complaining of nausea and vomiting. (*Id.*) Dr. Frank noted that there was mild inflammation in the antrum of Plaintiff's stomach, but that her duodenum, pylorus, cardia, and fundus all appeared normal. (*Id.*) Overall, Dr. Frank noted that "everything continued to look fine." (*Id.*)

On April 12, 2007, Plaintiff told Dr. Witkowski that she was still having occasional headaches, dizziness, and pain in her head. (R. at 441.) Dr. Witkowski noted that her neck pain and headaches could be related to the bulging disk in her neck. (*Id.*) Six days later, Plaintiff saw Dr. Witkowski for a workers compensation appointment. (R. at 442.) Plaintiff told him that she continued to have some problems with pain in her right shoulder. (*Id.*) Dr. Witkowski noted that Plaintiff needed further strengthening in her arm and that she should ask her neurologist when she could restart a work conditioning program. (*Id.*)

On May 17, 2007, Plaintiff told Dr. Witkowski that she continued to have a few problems with headaches on the right side of her head and with facial paresthesias. (R. at 443.) Dr. Witkowski told Plaintiff to continue to follow up with Dr. Azzouz for these problems. (*Id.*) Two months later, Plaintiff reported that she had not been having any "big problems with headaches." (R. at 444.) She also noted that her medications were helping for back pain. (*Id.*) On November 13, 2007, Plaintiff again reported that she had been experiencing no big problems with headaches or dizziness. (R. at 446.) She continued to have an occasional headache at times. (*Id.*)

On February 19, 2008, Plaintiff told Dr. Witkowski that she had been experiencing

occasional headaches on the right side of her head.  (R. at 447.)  She also reported continued visits with Neurology for these problems.  (*Id.*)    Three months later, Dr. Witkowski noted Plaintiff's statement that she had not been experiencing headaches, only "some occasional right facial pain." (R. at 427.)

On August 19, 2008, Dr. Sushil Sethi conducted a consultative examination of Plaintiff.  (R. at 279-85.)  Plaintiff complained of problems with her right shoulder, back, legs, toes and fingers, left knee, anxiety, memory problems, high blood pressure, and chronic gastritis.  (R. at 279.)  She also complained of severe headaches but also noted that she did not require hospitalization for them. (*Id.*)  Plaintiff complained that "stress of any kind bothers her," but she mentioned that she was not receiving mental health treatment and that her anxiety and memory problems were "variable."  (R. at 280.)  Dr. Sethi noted that Plaintiff's neurologic exam was normal, and he determined that she could have chronic sprains involving her neck and shoulder.  (R. at 281-82.)  He also concluded that Plaintiff has a history of "nonspecific" headaches that are treatable with oral medication.  (R. at 282.)  Overall, Dr. Sethi concluded that Plaintiff was "moderately limited" in her ability to work. (*Id.*)

On August 28, 2008, Dr. Thomas Lauderman, a consultant from the state agency, completed a Physical Residual Functional Capacity Assessment of Plaintiff.  (R. at 286-93.)  He determined that Plaintiff could occasionally lift or carry up to 20 pounds, frequently lift or carry up to 10 pounds, stand and/or walk and also sit for a total of about 6 hours in an 8-hour workday, and was unlimited with pushing and pulling.  (R. at 287.)  Furthermore, Dr. Lauderman determined that Plaintiff was occasionally limited in climbing, balancing, stooping, kneeling, crouching, and crawling. (R. at 288.)  He noted that his opinion was not significantly different from Dr. Sethi's

opinion that Plaintiff was only moderately limited in her ability to work. (R. at 292.) The next day, Dr. James Bartee conducted a psychiatric review of Plaintiff's file. (R. at 294-307.) He determined that Plaintiff had no medically determinable impairment. (R. at 294, 306.) Dr. Bartee made note of Plaintiff's complaints of anxiety and memory problems, but also noted that she had never sought treatment nor used medication for these conditions. (R. at 306.) Overall, Dr. Bartee found no functional limits "associated with anxiety or any other mental disorder." (*Id.*)

On September 24, 2008, Plaintiff was given a spinal examination at the Grafton City Hospital. (R. at 424.) The examination revealed "degenerative L4-5 disk space narrowing, endplate sclerosis and marginal osteophytosis and slight anterior positioning of L3 over L4." (*Id.*) However, the examination did not reveal any fractures or spondylitis. (*Id.*)

On October 8, 2008, Plaintiff told Dr. Witkowski that she had been under a great deal of stress and that she had a history of anxiety. (R. at 430.) This anxiety was due to her car being repossessed and her lack of income. (*Id.*) Dr. Witkowski noted that Plaintiff had not had any problems with headaches, but that she was experiencing symptoms similar to panic attacks. (*Id.*) He assessed that her anxiety was "definitely becoming a problem" and began Plaintiff on a prescription for Citalopram. (*Id.*)

On November 25, 2008, Dr. Karl Hursey, a consultant from the state agency, reviewed Plaintiff's file and concurred with the review that Dr. Bartee conducted in August of 2008. (R. at 310.) A week later, on December 2, 2008, Dr. Fulvio Franyutti, another consultant from the state agency, reviewed Plaintiff's file. (R. at 311-18.) Dr. Franyutti noted that Plaintiff can never balance and that she was limited in reaching in all directions. (R. at 313, 314.)

On November 26, 2008, Plaintiff told Dr. Witkowski that she felt "a little better" after

starting Citalopram. (R. at 432.) She noted that she did not feel quite as anxious but still felt "a little bit of depression, especially with the holidays coming up." (*Id.*) Dr. Witkowski increased her dosage of Citalopram at this visit. (*Id.*)

On February 25, 2009, Plaintiff had a regular visit with Dr. Witkowski. (R. at 433.) She reported that her right shoulder was bothering her and that she could feel pain in her neck and the right side of her face as well. (*Id.*) Plaintiff reported no big problems with headaches, and noted that her anxiety and depression were "fairly stable." (*Id.*) However, she had a bit more anxiety. (*Id.*) Dr. Witkowski continued Plaintiff on her prescription for Citalopram for the anxiety and depression. (R. at 434.) Three months later, Plaintiff told Dr. Witkowski that she had been experiencing chronic neck pain from bulging discs, but that she had not been having significant problems with headaches or dizziness. (R. at 435.) Furthermore, Plaintiff reported that she continued to take her Citalopram and that she was dealing with her anxiety and depression "quite well." (*Id.*)

### D.    *Testimonial Evidence*

At the hearing before the ALJ held on August 25, 2009, Plaintiff testified that she was single and lived with her goddaughter and her goddaughter's husband. (R. at 36.) She holds a West Virginia driver's license but does not have her own vehicle. (R. at 37.) Plaintiff has completed an eighth grade level of education. (*Id.*)

During the hearing, Plaintiff testified that she was a cashier at Wal-Mart from 1993 to 1996 and that she was also a cashier at Go Mart for some time after. (R. at 39.) She worked for Family Dollar from 1999 to 2005. (*Id.*) Plaintiff started as a cashier at Family Dollar, but she eventually became assistant manager and then as store manager. (*Id.*) At Family Dollar, she testified that she

was responsible for "everything," including computer work, unloading trucks, cleaning, and putting stock out on shelves. (*Id.*) Plaintiff also testified that she was responsible for changing store schematics as needed. (R. at 40.) At some point, she was injured and filed a workers' compensation claim, which resulted in a finding that she was eight percent disabled in her shoulder. (R. at 41.)

Plaintiff testified that she takes eight prescription medications, all prescribed by her family doctor, Dr. Mark Witowski. (R. at 41-42.) She asserted that she takes all medications as prescribed and that none of them have any side effects. (R. at 42.) Plaintiff has seen "Dr. Bob" for her surgery and mentioned that Dr. Witowski was sending her to see a podiatrist for her right foot. (*Id.*)

At the hearing, Plaintiff demonstrated that her left shoulder works better than her right shoulder, and she mentioned that her degree of movement in her right shoulder is the same as it was before her surgery. (R. at 43-44.) After the ALJ asked her about the work hardening she did, Plaintiff testified that she could not complete the work hardening because she began to experience spasms throughout her body. (R. at 44.) She also testified that she did not know what her reaction would be if she had an easier job that was not as rigorous as her past work at Family Dollar because she cannot stand or sit for very long and because she cannot stoop down like she used to. (R. at 45.) Plaintiff noted that she has calluses on her knees and a baker's cyst behind her knee on her left leg. (R. at 46.) However, she did not have surgery on the cyst because the surgeon, Dr. Woodward, told her that her main artery could be severed and she could be paralyzed or bleed to death. (*Id.*) Because of that, Plaintiff testified that she chose to "live with the pain." (*Id.*)

Also testifying at the hearing were two medical experts, Dr. Joseph Carver and Dr. Judith Brendemuehl. (R. at 28.) Dr. Carver testified that there is a psychological component to Plaintiff's case because she was being treated for depression with Celexa. (R. at 47.) However, Dr. Carver

also noted that Plaintiff made no mental health allegations. (R. at 48.) At the hearing. Dr. Carver assigned a Global Assessment of Functioning ("GAF") score of between 50 and 55 to Plaintiff. (*Id.*)

According to Dr. Brendemuehl, Plaintiff sustained a work-related injury which was a "full thickness tear of her supraspinatus tendon which is part of her rotator cuff." (R. at 49.) Plaintiff underwent arthroscopic and then open repair surgery for this injury on March 21, 2006. (*Id.*) She had some physical therapy and attempted work hardening but was unable to continue with this because of other problems. (*Id.*) Dr. Brendemuehl also testified that Plaintiff has cervical degenerative disc disease C5-6 that bulges to the left with no significant stenosis. (*Id.*) Plaintiff's baker's cyst on her left knee has never been fully investigated, but Dr. Brendemuehl noted that baker's cysts are often associated with meniscal tears. (*Id.*) Overall, Dr. Brendemuehl noted that Plaintiff has a light RFC with restrictions of overhead reaching. (*Id.*) She also opined that a sit/stand option would need to be added to Plaintiff's RFC because of her neck and back pain. (*Id.*) Finally, Dr. Brendemuehl testified that, in her opinion, there are objective conditions that could be sources of pain. (R. at 50.)

### E.    *Vocational Evidence*

Casey Vass, Vocational Expert, also testified at the hearing. The ALJ asked Mr. Vass to describe Plaintiff's past relevant work. (R. at 47.) Mr. Vass described Plaintiff's work as a cashier as light and unskilled with a Specific Vocational Preparation of 2. (*Id.*) He described her work as a store manager as light and skilled with a skill level of 6. (*Id.*) However, this past work was better classified as medium work because of Plaintiff's duties involving cleaning and stocking. (*Id.*) Mr. Vass also testified that for transferability, bookkeeping would be a sedentary function of Plaintiff's past work. (*Id.*)

## F.    *Lifestyle Evidence*

In an Adult Function Report dated July 29, 2008, Plaintiff reported that she spends her days taking care of her dog; doing housework, such as washing dishes, dusting, and running the sweeper; and watering flowers as needed. (R. at 165.) She also sweeps the porch and the sidewalk. (R. at 167.) She also takes a shower or washes off. (*Id.*) Plaintiff stated that there are some days when she doesn't do much because of her pain. (*Id.*)

Plaintiff also noted that she has some problems with personal care. It takes her a while to pull a shirt over her head, and while she can wash her hair, she can't lift her right arm up to style it. (R. at 166.) She also has trouble cutting her toe nails because of muscle spasms and cramps. (*Id.*)

According to Plaintiff, she does not do yard work because she gets too hot and passes out; however, she also reported going outside several times a day. (R. at 168.) She can walk, sometimes drive a car, and ride in a car. (*Id.*) Plaintiff shops two to three times per month for dog food, food, and her medicines. (*Id.*) She is able to count change, handle a savings account, and use a checkbook and money orders, but she reported an inability to pay bills because she has no income. (*Id.*)

Plaintiff enjoys watching television and playing games on the computer. (R. at 169.) She visits with friends and family about two to three times per month and talks on the phone with others almost every day. (*Id.*) She travels to stores regularly, and she also travels to her children's houses whenever they come to get her because she has no car. (*Id.*)

Plaintiff reported that she experienced no problems with paying attention or following instructions. (R. at 170.) She also stated that her condition did not affect her understanding. (*Id.*) Although she noted that she hates changes, Plaintiff did not note any specific problems. (R. at 171.) Finally, Plaintiff reported that she keeps herself busy to help manage stress. (*Id.*)

### G.     Other Evidence

On April 20, 2007, Plaintiff was awarded workers compensation for permanent partial disability. (R. at 118.) According to the letter, it was determined that Plaintiff has an eight percent permanent partial disability. (*Id.*) At the hearing, the ALJ noted that this finding represented a "floor" of Plaintiff's disability, but was not necessarily a "ceiling" of her disability. (R. at 41.)

## III.     CONTENTIONS OF THE PARTIES

Plaintiff, in her brief for judgment on the pleadings, asserts that the Commissioner's decision is not supported by substantial evidence. (Pl.'s Br. at 5.) Specifically, Plaintiff alleges that:

- The ALJ failed to comply with Social Security Ruling ("SSR") 96-8p when he assessed Plaintiff's Residual Functional Capacity ("RFC"); and

- The ALJ erred by not eliciting Vocational Expert ("VE") testimony regarding her ability to perform past relevant work, "given the significant exertional and non-exertional limitations" in her RFC.

(*Id.* at 2.) Plaintiff asks the Court to either reverse the Commissioner's decision or remand the case to the ALJ. (*Id.* at 5.)

Defendant, in his motion for summary judgment, asserts that the decision is "supported by substantial evidence and should be affirmed as a matter of law." (Def.'s Mot.) Specifically, Defendant alleges that:

- The medical and non-medical evidence do not support Plaintiff's allegation that she would have trouble working on a regular and consistent basis; and

- Plaintiff did not meet her burden of proving that she could not perform her past relevant work.

(Def.'s Br. in Supp. of Def.'s Mot. for Summ. J. ("Def.'s Br.") at 13, 15.)

## IV.    STANDARD OF REVIEW

The United States Court of Appeals for the Fourth Circuit ("Fourth Circuit") applies the

following standards in reviewing the decision of an ALJ in a Social Security disability case:

> Judicial review of a final decision regarding disability benefits . . . is limited to
> determining whether the findings . . . are supported by substantial evidence and
> whether the correct law was applied. *See* 42 U.S.C. § 405(g) ( "The findings . . . as
> to any fact, if supported by substantial evidence, shall be conclusive . . . ."));
> *Richardson v. Perales*, 402 U.S. 389, 390, 91 S. Ct. 1420, 1422 (1971); *Coffman v.
> Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).  The phrase "supported by substantial
> evidence" means "such relevant evidence as a reasonable person might accept as
> adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. at 401, 91 S. Ct.
> at 1427 (citing *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206,
> 216 (1938)) . . . . If there is evidence to justify a refusal to direct a verdict were the
> case before a jury, then there is "substantial evidence." *Laws v. Celebrezze*, 368 F.2d
> 640, 642 (4th Cir. 1966).  Thus, it is not within the province of a reviewing court to
> determine the weight of the evidence, nor is it the court's function to substitute its
> judgment . . . if the decision is supported by substantial evidence.  *See Laws v.
> Celebrezze*, 368 F.2d at 642; *Snyder v. Ribicoff*, 307 F.2d 518, 529 (4th Cir. 1962).

*Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990).  The Fourth Circuit has defined substantial

evidence as "evidence which a reasoning mind would accept as sufficient to support a particular

conclusion.  It consists of more than a mere scintilla of evidence but may be somewhat less than a

preponderance."  *Laws,* 368 F.2d at 642.

Because review is limited to whether there is substantial evidence to support the ALJ's

conclusion, "[t]his Court does not find facts or try the case *de novo* when reviewing disability

determinations."  *Seacrist v. Weinberger*, 538 F.2d 1054, 1056-57 (4th Cir. 1976).  Furthermore,

**"the language of § 205(g) . . . requires that the court uphold the decision even should the court**

**disagree with such decision as long as it is supported by 'substantial evidence.'"** *Blalock v.*

*Richardson*, 483 F.2d 773, 776 (4th Cir. 1972) (emphasis added).


# V.    DISCUSSION

*A.    Standard for Disability and the Five-Step Evaluation Process*

To be disabled under the Social Security Act, a claimant must meet the following criteria:

An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work . . . . "[W]ork which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

*See* 42 U.S.C. § 423(d)(2)(A) (2006).  The Social Security Administration uses the following five-step sequential evaluation process to determine if a claimant is disabled:

(i) At the first step, we consider your work activity, if any.  If you are doing substantial gainful activity, we will find that you are not disabled.

(ii) At the second step, we consider the medical severity of your impairment(s).  If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.

(iii) At the third step, we also consider the medical severity of your impairments(s).  If you have an impairment(s) that meets or equals one of our listings . . . and meets the duration requirement, we will find that you are disabled.

[Before the fourth step, the residual functioning capacity of the claimant is evaluated based "on all the relevant medical and other evidence in your case record . . . ." 20 C.F.R. §§ 404.1520; 416.920 (2011).]

(iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work.  If you can still do your past relevant work, we will find that you are not disabled.

(v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. §§ 404.1520; 416.920 (2011). If the claimant is determined to be disabled or not disabled at any of the five steps, the process does not proceed to the next step. *Id.*

## B.  *Discussion of the Administrative Law Judge's Decision*

Utilizing the five-step sequential evaluation process outlined above, the ALJ made the following findings:

1. **The claimant meets the insured status requirements of the Social Security Act through March 31, 2011 (Exhibit 6D).**

2. **The claimant has not engaged in substantial gainful activity since October 27, 2005, the alleged onset date (Exhibit 6D; 20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).**

3. **The claimant has the following severe impairments: osteoarthrosis and allied disorders and gastritis (20 CFR 404.1520(c) and 416.920(c)).**

4. **The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).**

5. **After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a limited range of light work as defined in 20 CFR 404.1567(b) and 416.967(b) except the claimant can perform jobs that do not require overhead reaching; and jobs that permit her to alternate sitting and standing throughout the workday.**

6. **The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).**

7. **The claimant was born on March 8, 1952 and was 53 years old, which is defined as an individual closely approaching advanced age, on the alleged disability onset date (20 CFR 404.1563 and 416.963).**

8.        **The claimant has a limited education and is able to communicate in English (20 CFR 404.1564 and 416.964).**

9.        **Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2.)**

10.      **Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).**

11.      **The claimant has not been under a disability, as defined in the Social Security Act, from October 27, 2005 through the date of this decision (20 CFR 404.1520(g) and 416.920(g)) on the evidence presented under the law.**

(R. at 22-27.)

## C.    *Discussion of the Appeals Council's Decision*

After reviewing the ALJ's decision and the entire record, the Appeals Council made the following findings:

1.        **The claimant met the special earnings requirement of the Act on October 27, 2005, the date the claimant stated she became unable to work and met them through March 31, 2011.**

   **The claimant has not engaged in substantial gainful activity since 2006.**

2.        **The claimant has alleged the following severe impairments: osteoarthritis, allied disorders, and gastritis.**

3.        **The claimant's combination of impairments results in the following limitations on her ability to perform work-related activities: light work with a restriction from overhead reaching; and a limitation to jobs that permit her to alternate sitting and standing throughout the workday.**

4.        **The claimant's subjective complaints are not fully credible for the reasons identified in the Administrative Law Judge's decision.**

5.      **The claimant is capable of performing her past relevant work as a store manager; she can perform this job as it is generally performed.**

6.      **The claimant is not disabled as defined in the Social Security Act.**

(R. at 5.)

## D.     *Substantial Evidence Supports the Commissioner's Decision*

### 1.     **Substantial Evidence Supports the ALJ's Assessment of Plaintiff's RFC**

As her first assignment of error, Plaintiff argues that the ALJ failed to comply with Social Security Ruling 96-8p when assessing Plaintiff's residual functional capacity ("RFC"). (Pl.'s Br. at 2.) Specifically, Plaintiff asserts that the ALJ failed to consider her non-exertional limitations regarding her anxiety, headaches, and inability to concentrate. (*Id.*) However, Plaintiff's argument is without merit because substantial evidence supports the ALJ's assessment of Plaintiff's RFC.

Under the Social Security Act, a claimant's RFC represents the most a claimant can do in a work setting despite the claimant's physical and mental limitations. 20 C.F.R. §§ 404.1545(a)(1); 416.945(a)(1) (2011). "RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis;" that is, for "8 hours a day, for 5 days a week, or an equivalent work schedule." SSR 96-8p, 1996 WL 374184, at *1 (July 2, 1996). The Administration is required to assess a claimant's RFC based on "all the relevant evidence" in the case record. 20 C.F.R. §§ 404.1545(a)(1); 416.945(a)(1). This assessment only includes the "functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments, including the impact of any related symptoms." SSR 96-8p, at *1. Even though the Administration is responsible for assessing RFC, the claimant has the burden of proving her RFC. *See Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1993) (per curiam) (citing *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983)) (claimant has

the burden of production and proof through the fourth step of the sequential analysis); *see also* 20 C.F.R. §§ 404.1545(a)(3); 416.945(a)(3) (claimant is responsible for providing evidence to be used to develop RFC).

When assessing RFC, the ALJ "must address both the remaining exertional and nonexertional capacities of the individual." SSR 96-8p, at *5. Exertional capacity refers to the claimant's limitations on physical strength, while nonexertional capacity "considers all work-related limitations and restrictions that do not depend on an individual's physical strength." *Id.* at *5-6. Nonexertional capacity "must be expressed in terms of work-related functions." *Id.* at *6. A claimant's statements alone are not sufficient to establish "a physical or mental impairment." 20 C.F.R. §§ 404.1528(a); 416.928(a). Furthermore, the United States Court of Appeals for the Fourth Circuit ("Fourth Circuit") has held that when a claimant presents substantial evidence tending to show the presence of nonexertional limitations, the ALJ must make a finding as to the existence of those impairments in his decision. *Grant*, 699 F.2d at 192; *see also Hall v. Harris*, 658 F.2d 260, 266 (4th Cir. 1981).

Contrary to Plaintiff's assertion, the ALJ did specifically consider whether Plaintiff's complaints of headaches, anxiety, and inability to concentrate were nonexertional limitations as required under *Grant*. The ALJ noted that Plaintiff's osteoarthrosis and allied disorders and gastritis were severe impairments. (R. at 23.) Specifically, the ALJ determined that Plaintiff's other alleged impairments were not severe "because they did not exist for a continuous period of at least 12 months, were responsive to medication, did not require any significant medical treatment, and did not result in any continuous exertional or nonexertional functional limitations." (*Id.*)

First, Plaintiff argues that her headaches caused her to undergo an MRI on February 15,

2007, and that this MRI "showed mild to moderate small vessel changes." (Pl.'s Br. at 3.) However, this same MRI identified "no acute infarction" and "[n]o other abnormalities." (R. at 339.) Furthermore, multiple medical records in the administrative record show that Plaintiff repeatedly had normal neurologic exams. (*See, e.g.,* R. at 281, 382.) Dr. Witkowski's notes following his appointments with Plaintiff also reveal that by May 28, 2009, Plaintiff reported having no significant problems with headaches. (R. at 430, 431, 433, 435, 440, 443, 444, 446, 447.) Notably, Plaintiff did not provide testimony that she experiences significant problems with headaches at the hearing before the ALJ, and neither Dr. Carver nor Dr. Brendemuehl specifically noted that Plaintiff experienced headaches that affect work-related functions. (R. at 35-50.) Drs. Carver and Brendemuehl gave this testimony after reviewing Plaintiff's file (R. at 31), and Plaintiff's attorney chose not to question either witness (R. at 48, 50). Therefore, Plaintiff's statements alone are not sufficient to establish that her headaches are a severe impairment. *See* 20 C.F.R. §§ 404.1528(a); 416.928(a).

Plaintiff further alleges that her headaches, anxiety, and concentration problems "would likely cause [her to] have trouble maintaining work on a regular and continuing basis." (Pl.'s Br. at 3 (alteration in original).) Again, substantial evidence in the record refutes Plaintiff's assertion. Dr. Witkowski's notes indicate that by May 28, 2009, Plaintiff was dealing with her anxiety and depression "quite well." (R. at 435; *see also* R. at 432, 433.) At the hearing before the ALJ, Dr. Carver testified that Plaintiff had no history of psychological treatment. (R. at 48.) Dr. Carver also testified that Plaintiff has "mild chronic depression" that responds well to the use of an antidepressant. (R. at 47, 48.) Notably, Plaintiff did not testify that Dr. Witkowski had ever sent her to a specialist for her depression (R. at 42), and Plaintiff's attorney did not question Dr. Carver

when provided an opportunity to do so (R. at 48). Therefore, Plaintiff's statements about her anxiety are not sufficient to establish a limitation. *See* 20 C.F.R. §§ 404.1528(a); 416.928(a).

Finally, the Adult Function Report Plaintiff completed on July 29, 2008 belies her assertion that she has problems maintaining concentration. In this report, Plaintiff did not note that her conditions affect her understanding or concentration. (R. at 170.) She stated that she has no problems paying attention, no problems following instructions, and that she finishes what she starts. (*Id.*) Plaintiff also stated that she keeps herself busy to handle stress. (R. at 171.)

In sum, the undersigned finds that the ALJ did comply with SSR 96-8p when assessing Plaintiff's RFC. The ALJ's opinion noted that besides Plaintiff's osteoarthrosis and allied disorders and gastritis, none of her other alleged impairments could be considered "continual exertional or nonexertional functional limitations." (R. at 23.) Therefore, the ALJ complied with *Grant*'s requirement that a finding be made concerning whether nonexertional limitations exist, *Grant*, 699 F.2d at 192, and substantial evidence supports the ALJ's assessment that Plaintiff's RFC did not contain nonexertional limitations.

### 2. Substantial Evidence Supports the Appeals Council's Decision Regarding Plaintiff's Ability to Perform Past Relevant Work

As her second assignment of error, Plaintiff alleges that the "ALJ erred in not eliciting VE testimony with regard to [her] ability to perform her past relevant work, given the significant exertional and non-exertional limitations in [her] RFC." (Pl.'s Br. at 3 (alterations in original).) However, Plaintiff's argument is without merit because she failed to meet her burden of proving that she could not perform her past relevant work.

During the fourth step of the sequential analysis for disability, the Administration considers the claimant's RFC and past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv); 416.920(a)(4)(iv).

If an ALJ determines that a claimant is able to perform past relevant work, the claimant will not be found disabled. *Id.* A finding of "not disabled" is warranted if a claimant "is capable of performing his past relevant work either as he performed it in the past or as it is generally required by employers in the national economy." *Pass v. Chater*, 65 F.3d 1200, 1207 (4th Cir. 1995); *see also* SSR 82-61, 1982 WL 31387, at *2 (1982). The Fourth Circuit has held that the Commissioner is entitled to rely on descriptions of job categories contained in the *Dictionary of Occupational Titles* ("*DOT*") as "presumptively applicable to a claimant's prior work." *DeLoatche v. Heckler*, 715 F.2d 148, 151 (4th Cir. 1893). As mentioned above, the burden of production and proof is on the claimant through the fourth step of the sequential analysis. *Hunter*, 993 F.2d at 35 (citing *Grant*, 699 F.2d at 191). To meet this burden, the claimant must "show an inability to return to her previous work (*i.e.,* occupation), and not simply to her specific prior job." *DeLoatche*, 715 F.2d at 151 (citing *Jock v. Harris*, 651 F.2d 133, 135 (2d Cir. 1981)).

Here, Plaintiff has failed to meet her burden of production and proof to show that she is unable to perform her past relevant work. At the hearing before the ALJ, Mr. Casey Vass, an impartial VE, testified regarding Plaintiff's past relevant work. (R. at 46-47.) Mr. Vass noted that according to the *DOT*, work as a store manager is classified as light work; however, Mr. Vass also testified that Plaintiff's past work as a store manager was probably better classified as medium work because of the cleaning and stocking duties involved. (R. at 47.) Mr. Vass also classified Plaintiff's past work as a cashier as light, unskilled work. (*Id.*) Notably, Plaintiff's attorney failed to question the VE when given the opportunity to do so. (*Id.*) Furthermore, Plaintiff was given the opportunity to submit more evidence to the Appeals Council after the Council granted Plaintiff's request for review of the ALJ's decision. (R. at 9.) However, Plaintiff, through her attorney, only submitted

a letter to the Appeals Council (R. at 216) and did not submit any additional evidence regarding her inability to perform her past relevant work as a store manager. The Appeals Council, after reviewing the ALJ's decision, determined that Plaintiff could not perform her past relevant work as a store manager as she actually performed it because her current RFC is for a reduced range of light work. (R. at 5.) However, the Appeals Council found that because the *DOT* classifies work as a store manager as light exertional work, Plaintiff could perform her past relevant work as it is generally performed. (*Id.*); *see also Pass*, 65 F.3d at 1207.

In sum, the undersigned finds that the ALJ was not required to further develop the testimony of the VE because the burden fell on Plaintiff to demonstrate that she is unable to perform her past relevant work as it is generally performed. *See Hunter*, 993 F.2d at 35 (citing *Grant*, 699 F.2d at 191). Not only did Plaintiff's attorney not question the VE at the hearing before the ALJ (R. at 47), but Plaintiff's attorney also did not submit any additional evidence regarding Plaintiff's inability to perform her past relevant work to the Appeals Council. Therefore, substantial evidence supports the Appeals Council's determination that Plaintiff is able to perform her past relevant work as it is generally performed.

## VI.    RECOMMENDATION

For the reasons stated herein, I find that the Commissioner's decision denying the Plaintiff's application for disability insurance benefits and supplemental security income is supported by substantial evidence. Accordingly, I **RECOMMEND** that the Defendant's Motion for Summary Judgment (ECF No. 12) be **GRANTED**, the Plaintiff's Brief in Support of Judgment on the Pleadings (ECF No. 11) be **DENIED**, and the decision of the Commissioner be affirmed and this case be **DISMISSED WITH PREJUDICE**.

Any party may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Frederick P. Stamp, Jr., United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); *Thomas v. Arn,* 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v Schronce*, 727 F.2d 91 (4th Cir. 1984), *cert. denied*, 467 U.S. 1208 (1984).

The Court directs the Clerk of the Court to provide a copy of this Report and Recommendation to all counsel of record, as provided in the Administrative Procedures for Electronic Case Filing in the United States District Court for the Northern District of West Virginia. Respectfully submitted this **20th** day of **October, 2011.**

_David J. Joel_

DAVID J. JOEL
UNITED STATES MAGISTRATE JUDGE